UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JAMES T. NORVELL,<br><br>　　　　　　　　Plaintiff,<br>　v.<br>BNSF RAILWAY COMPANY,<br><br>　　　　　　　　Defendant. | CASE NO. C17-5683 BHS<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Defendant BNSF Railway Company's ("BNSF") motion for summary judgment. Dkt. 50. The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants in part and denies in part the motion for the reasons stated herein.

ORDER - 1

## I. PROCEDURAL HISTORY

On August 29, 2017, Plaintiff James Norvell ("Norvell") filed a complaint against BNSF asserting a claim for wrongful discharge in violation of public policy and a claim for intentional infliction of emotion distress (commonly referred to as "outrage"). Dkt. 1.

On October 11, 2017, BNSF filed a motion to dismiss for failure to state a claim. Dkt. 10. On January 2, 2018, the Court denied the motion because Norvell alleged sufficient facts to state claims for relief. Dkt. 17.

On September 13, 2018, the Washington Supreme Court issued its opinion in *Martin v. Gonzaga Univ.*, 191 Wn.2d 712 (2018), and clarified the standard for claiming discharge in violation of public policy based on whistle-blowing activity.

On July 9, 2019, BNSF filed a motion for summary judgment. Dkt. 50. On July 29, 2019, Norvell responded. Dkt. 55. On August 2, 2019, BNSF replied and moved to strike some evidence submitted by Norvell.[1] Dkt. 58.

## II. FACTUAL BACKGROUND

In 2002, BNSF hired Norvell as a Trainman. In 2005, Norvell became an Engineer operating locomotives, a position he held until his termination.

On June 10, 2015, Norvell was operating a train near Bingen, Washington. Norvell ran through a grade crossing (street intersection) while failing to sound the required whistle signal prior to entering the crossing as required by BNSF's rules.

---

[1] The Court agrees with BNSF that Norvell has submitted inadmissible and irrelevant evidence. The Court, however, will set forth the admissible evidence it relies upon in reaching its conclusions instead of conducting an item by item analysis of the contested evidence.

Norvell admitted his violation of the rules, and the parties agreed to a "Level S" 30 Day Record Suspension.

On the night of July 13, 2015, Norvell was assigned to operate locomotive 2339 ("2339") in BNSF's Portland, Oregon Terminal. During his shift Norvell was assigned to perform a reverse "shoving" movement of twenty-two cars from Lake Yard into Willbridge Yard. The twenty-two cars included sixteen loaded cars and six empties with a total weight of 2246 tons and a total length of 1290 feet. The distance between Lake Yard and Willbridge Yard was a mile or less with the track on a downhill grade. Prior to performing this twenty-two car shove, Norvell did not request that any air brakes be cut in to any of the cars in the train by his crew, instead relying solely on the locomotive brakes.

Norvell pulled the cars forward out of Lake Yard going northbound and uphill, before coming to a stop. Norvell began shoving the train in reverse (pushing them backwards) downhill into the Willbridge Yard. Norvell took the train all the way up to ten miles per hour, which was the maximum speed in the yard. When Norvell attempted to stop, the locomotive brakes did not sufficiently slow the train. Norvell reacted and threw the reverser forward against the movement of the train all the way to the maximum thrust, and the train came to an abrupt stop. Norvell admitted he was unaware at that time of Air Brake and Train Handling Rule ("ABTH") 103.11.5, which states the "[r]everser handle must not be moved to any position other than in the direction of travel while locomotive is moving . . . ." In his deposition, Norvell describes the situation as follows:

> Q: So at the time this happened, what did you know was at the end of that track?
> A: Well, earlier in the night we had set some loaded hazardous tank cars down on the lead. And we would have crashed into those.
> ****
> Q: Did you have any — was there any other braking applications that you can use at that point?
> A: No.
> Q: So what did you do next?
> A: I threw the reverser.
> Q: And what prompted you to do that?
> A: I was out of options.
> ****
> Q: Is it possible the train would have stopped on its own?
> A: No.
> ****
> Q: Was there anything else in the area that was a potential hazard for that train if it would have kept rolling?
> A: Well, north Portland, specifically that area, is where they store all the fuels, you know, jet fuel, ab gas. Take your pick. It's a pretty highly flammable area.
> Q: Was it possible, in your knowledge, for the train to have collided with those tanks or any of that?
> A: I think it was very possible.
> ****
> Q: Was there anything else down there on that end that was dangerous, that would have been a danger for a train —
> A: The whole area is a giant tank farm.
> Q: I'm asking you, though, would it have been possible for those – for your cars to have gotten to those tanks?
> A: Yes.
> ****
> Q: Do you know, how far were those tank cars at the end of the track to these fuel tanks?
> A: Close enough proximity that I was worried about it.

Dkt. 51-1, Deposition of James Norvell at 139:4–8, 144:23–145:4, 191:22–24, 193:4–14, 194:15–22, 196:2–5.  Norvell further testified that his co-worker, John Reynolds, was "riding the side of the car" at the end of the train, an accepted practice at BNSF where the employee hangs onto the side of a car at the head end of the train via "a stirrup step and

grab irons." *Id.* at 118:16–19:7. At the end of the shift Norvell called his supervisor Dwight Lathim ("Lathim") and told him that he needed to get another locomotive on site because 2339 had flat spots on the wheels.

The next morning, BNSF maintenance inspected the wheels on locomotive 2239. They determined that the flat spots on the wheel exceeded federal regulations and that the locomotive should not move until the wheels were replaced. The total cost of the damages to the wheels was approximately $22,400.

On August 10, 2015, BNSF conducted an investigatory hearing pursuant to the collective bargaining agreement ("CBA") between BNSF and Norvell's union. On August 20, 2015, Hearing Officer Kevin Baker sent an email concluding and recommending as follows:

> Based on the testimony and exhibits in this investigation I believe Mr. Norvell violated rule [General Code of Operating Rules ("GCOR")] 1.6 "Conduct" item 1 (careless of the safety of themselves or others) and item 2 (negligent) as well as failed to comply with Air Brake and Train Handling Rule 103.11 while operating as an engineer on job Y-WLB3051-12. Because Mr. Norvell moved the reverser to the forward position while he was operating his train in reverse at 10MPH and put the throttle to notch 8, the wheels on the BNSF 2339 locked up. [Michael] Hoover demonstrated through the downloads, taken from the BNSF 2339, that the actions Mr. Norvell took would certainly have created large enough flat spots to the wheels to make them exceed the FRA threshold and require immediate replacement. I also believe the 10MPH speed at which Mr. Norvell was operating while shoving down a descending grade without any airbrakes connected to the cars and more weight than they had handled in their shift up to that time was careless and put the safety of Mr. Reynolds at risk. The actions Mr. Norvell took while working Y-WLB3051-12 caused $22,478.37 of damage to the BNSF 2339 as well as several days of down time for a valuable BNSF Asset.
> For Discipline:
> I recommend a serious rules violation (level "S") for Mr. Norvell.

Dkt. 53-8 at 2.

On August 21, 2015, Chris Delargy, BNSF's Portland Terminal Superintendent, in accordance with BNSF's Policy for Employee Performance Accountability ("PEPA"), forwarded Baker's email to the PEPA team for review prior to a final decision being made. Delargy wrote:

> Pepa team, this is for your review. This will be Mr. Norvell's second Level S in 2015. His first was when he was an engineer and part of a crew that failed to blow the whistle at two at grade crossings – he signed a waiver for this event. Below is a second Level S for causing significant damage to BNSF equipment by failing to use the proper rules to stop his train movement in accordance with good train handling.

Dkt. 53-9 at 2. On August 26, 2015, Kathleen Maglisceau with BNSF's labor relations group reviewed the transcript, exhibits and Norvell's disciplinary history, and responded that "dismissal is supported on the basis of second Level S." On August 31, 2019, Jared Wooten, BNSF's Portland General Manager, terminated Norvell's employment in a letter as follows:

> you are hereby dismissed effective immediately from employment with the BNSF Railway Company for failure to safely operate your train, specifically, when you failed to properly stop your movement in accordance with proper train handling resulting in significant damage to locomotive BNSF 2339 while working as Engineer on job Y-WLB3051-12 on duty 2330 on July 12, 2015 in Portland, OR.
> It has been determined through testimony and exhibits brought forth during the investigation that you were in violation of ABTHR 103.11 Switching Movements, GCOR 1.6 Conduct, GCOR 7.1 Switching Safely and Efficiently and GCOR 1.3.1 Rules, Regulations, and Instructions.

Dkt. 53-10.

Norvell appealed the termination pursuant to the CBA. On July 15, 2019, the arbitration panel found as follows: "The Board having reviewed all testimony and

evidence in this case and finds there is insufficient evidence that Claimant violated the cited rules. Back pay is awarded for all time lost, with deduction of outside earnings." Dkt. 55-4 at 6.

## III.  DISCUSSION

BNSF moves for summary judgment on Norvell's claim for wrongful discharge in violation of public policy and claim for outrage.

### A.  Summary Judgment Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

**B.    Wrongful Discharge**

Generally, employment in Washington State may be terminated at will by either the employee or employer. However, "[o]ne narrow exception to the general at-will employment rule prohibits an employer from discharging an employee 'when the termination would frustrate a clear manifestation of public policy.'" *Roe v. TeleTech Customer Care Mgmt. (Colorado) LLC*, 171 Wn.2d 736, 755 (2011) (quoting *Ford v. Trendwest Resorts, Inc.*, 146 Wn.2d 146, 153 (2002). The tort for wrongful discharge in violation of public policy has generally been limited to four scenarios: "(1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers'

compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistle-blowing." *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 936 (1996) (citing *Dicomes v. State*, 113 Wn.2d 612, 618 (1989)).

If the plaintiff's activity falls within one of these categories, then the "plaintiff employee must demonstrate that his or her 'discharge may have been motivated by reasons that contravene a clear mandate of public policy.'" *Martin*, 191 Wn.2d at 723 (quoting *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232–33 (1984)). The employee must also show "that the public-policy-linked conduct was a 'significant factor' in the decision to discharge the worker." *Thompson*, 102 Wn.2d at 232. Then, "the burden shifts to the employer to prove that the dismissal was for reasons other than those alleged by the employee." *Thompson*, 102 Wn.2d at 232. "This is a burden of production, not persuasion." *Martin*, 191 Wn.2d at 726. If the employer articulates such a reason, the burden shifts back to the plaintiff either to show "that the reason is pretextual, or by showing that although the employer's stated reason is legitimate, the [public-policy-linked conduct] was nevertheless a substantial factor motivating the employer to discharge the worker." *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 73 (1991).

In this case, Norvell alleges that he was wrongfully discharged for engaging in three protected activities as follows: (1) Norvell, in performing the emergency stopping maneuver on or about July 12, 2015, performed a public duty or obligation by preventing a potential catastrophe that would have caused great harm to the public at large, Dkt. 1, ¶ 42; (2) Norvell, in reporting safety defects in BNSF's locomotives exercised a legal right

or privilege, *id.* ¶ 43; (3) Norvell, in bringing to light BNSF's substandard and dangerous locomotives engaged in whistleblowing activity, *id.* ¶ 44. BNSF contends that "Norvell has failed to establish that these actions constituted activity that qualify for protection as a public policy under Washington law." Dkt. 50 at 3. Regarding the reporting of safety defects and whistleblowing activity, Norvell fails to respond to BNSF's motion. Thus, the Court finds that Norvell has failed to establish his prima facie case by showing that these activities were substantial factors motivating his termination, and the Court grants BNSF's motion on these issues. The Court turns to Norvell's remaining theory of liability.

        **1.**        **Prima Facie Case**

Although Norvell alleged in his complaint that his emergency stopping maneuver prevented "great harm to the public at large," he further clarified in his response to BNSF's motion to dismiss that "his emergency stopping maneuver was necessary to avoid a catastrophe that could have injured or killed co-workers and the public at large," Dkt. 13 at 6. The Court accepted the further clarification of preventing an injury or death to him or his co-workers and denied BNSF's motion in light of *Gardner*, which provides that "[s]ociety places the highest priority on the protection of human life. This fundamental public policy is clearly evidenced by countless statutes and judicial decisions." 128 Wn.2d at 944. Norvell has submitted evidence in support of his position that he executed the maneuver to prevent both his and his co-worker Reynold's injury or death. The Court finds that this evidence is sufficient to place Norvell's activity within the public policy announced in *Gardner*.

1       BNSF completely ignores Norvell's evidence and instead argues that there is no

2 public policy for the general safety of the public at large. Dkt. 50 at 16–18. For example,

3 BNSF argues that Norvell is asking the Court to establish "a general safety policy . . . to

4 prevent damage to a locomotive in a railroad yard." *Id.* at 17. In making this argument,

5 BNSF is setting up its own strawman instead of addressing the evidence in the record.

6 To the extent that injury or death was imminent, BNSF fails to provide any argument or

7 authority to undermine the conclusion that *Gardner* establishes a general public policy in

8 the preservation of life despite Norvell performing a prohibited maneuver and damaging

9 BNSF's equipment. Therefore, the Court denies BNSF's motion on this issue.

10       Once Novell establishes that his discharge may have been motivated by reasons

11 that contravene a clear mandate of public policy, he must show "that the public-policy-

12 linked conduct was a 'significant factor' in the decision to discharge the worker."

13 *Thompson*, 102 Wn.2d at 232. In this case, Novell's termination letter establishes that he

14 was terminated for a failure "to properly stop [his train's] movement in accordance with

15 proper train handling resulting in significant damage to locomotive BNSF 2339 . . . ."

16 Dkt. 53-10 at 2. While this does not explicitly state Norvell was terminated for

17 protecting human life or preventing injury, the failure to properly stop the train was the

18 decision to perform the emergency stopping maneuver. This stated reason establishes

19 that Novell's protected conduct was a significant factor in BNSF's decision to terminate

20 him. Therefore, the Court finds that Norvell has established a prima facie case of

21 wrongful termination in violation of public policy.

22

### 2. BNSF's Burden

The burden now shifts to BNSF to produce evidence that the dismissal was for reasons other than those alleged by the employee. *Thompson*, 102 Wn.2d at 232; *Martin*, 191 Wn.2d at 726. BNSF argues that it "terminated Norvell because his failure to follow safety and operational rules resulted in his second Level S discipline in just over a month." Dkt. 50 at 19. This argument in based on Norvell's actions leading up to the decision to use the reverser and is set forth in the second paragraph of Norvell's termination letter as follows: "It has been determined through testimony and exhibits brought forth during the investigation that you were in violation of ABTHR 103.11 Switching Movements, GCOR 1.6 Conduct, GCOR 7.1 Switching Safely and Efficiently and GCOR 1.3.1 Rules, Regulations, and Instructions." Dkt. 53-10 at 2. The Court finds that BNSF has met its burden of production.

### 3. Pretext

Novell now bears the burden to show that BNSF's "reason is pretextual" or "that although the employer's stated reason is legitimate, the [public-policy-linked conduct] was nevertheless a substantial factor motivating the employer to discharge the worker." *Wilmot*, 118 Wn.2d at 73. On the issue of pretext, BNSF string cites federal authorities for the proposition that the "law is clear that to show pretext Norvell must do more than show BNSF was mistaken or wrong in its decision, he has to establish through admissible facts that BNSF's decision was implausible, inconsistent, contradictory or incoherent such that the decision is unworthy of credence." Dkt. 58 at 9 (citing *Dept. of Fair Emp. and Housing v. Lucent Technologies, Inc.*, 642 F.3d 728, 746 (9th Cir. 2011); *Cuevas v.*

*Skywest Airlines*, 17 F.Supp.3d 956, 966 (N.D. Cal. 2014); *Coleman v. Donahoe*, 906 F.Supp.2d 917, 928 (D. Alaska 2012); *Morgan v. Regents of the Univ. of Cal.*, 88 Cal.App.4th 52, 105 Cal.Rptr.2d 652, 670 (2000)). BNSF fails to articulate whether Washington has adopted these federal authorities and fails to cite any Washington authority that similarly defines pretext. Regardless, Norvell has met the alternative burden by showing that his use of the emergency maneuver was a substantial factor motivating his discharge because it was one of the two reasons given in his termination letter. Therefore, the Court denies BNSF's motion on this theory supporting Norvell's wrongful termination claim.

C.  **Outrage**

"Outrage requires proof of three elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of severe emotional distress." *Robinson v. Pierce Cty.*, 539 F. Supp. 2d 1316, 1332 (citing *Kloepfel v. Bokor*, 149 Wn.2d 192, 195 (2003)). "The alleged conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* at 1332–33 (2008) (quoting *Grimsby v. Samson*, 85 Wn.2d 52, 59 (1975)). "Whether the conduct is sufficiently outrageous is ordinarily a question for the jury, but courts must initially determine if reasonable minds could differ as to whether the conduct was sufficiently extreme to result in liability." *Id.* at 1333 (citing *Phillips v. Hardwick*, 29 Wn. App. 382, 387 (1981)). "To prevail on an outrage claim, a plaintiff is required to come forward with evidence that he or she actually suffered severe emotional

distress as a result of the defendant's conduct." *Sutton v. Tacoma Sch. Dist. No. 10*, 180 Wn. App. 859, 871 (2014) (citing *Kloepfel*, 149 Wn.2d at 203).

In this case, Novell fails to submit sufficient evidence on every element of his claim. The Court will not address whether material questions of fact exist on the first two elements of the claim because Norvell has failed to submit any evidence that he suffered *severe* emotional distress. BNSF contends that "[o]ther than worrying about if anything goes wrong, he could not cite any specific examples nor did he seek any evaluation or treatment." Dkt. 50 at 24 n.14 (citing Dkt. 51-1 at 32). Having read the pertinent sections of Norvell's deposition, the Court agrees with BNSF. Norvell states that his girlfriend can testify to what he has gone through, and Norvell diagnosed himself with PTSD. *See* Dkt. 55-8 at 49–51. This evidence, however, fails to establish *severe* emotional distress. *Sutton*, 180 Wn. App. at 872 ("liability arises only when the emotional distress is extreme."). Moreover, Norvell fails to even address this argument in his response. *See* Dkt. 55 at 7 (facts section), 18 (outrage discussion section). Where no factual showing is made in opposition to a motion for summary judgment, the District Court is not required to search the record *sua sponte* for some genuine issue of material fact. *See Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). Based on the evidence cited by BNSF and the Court's reading of the deposition, the Court concludes that Norvell has failed to submit sufficient evidence to establish that he suffered severe emotional distress from either the trainyard incident or his termination. Therefore, the Court grants BNSF's motion on this claim.

## IV. ORDER

Therefore, it is hereby **ORDERED** that BNSF's motion for summary judgment, Dkt. 50, is **GRANTED in part** and **DENIED in part** as stated herein.

Dated this 21st day of August, 2019.

BENJAMIN H. SETTLE
United States District Judge