UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JAMES T. NORVELL,<br><br>           Plaintiff,<br><br>  v.<br><br>BNSF RAILWAY COMPANY,<br><br>           Defendant. | CASE NO. C17-5683 BHS<br><br>ORDER |

THIS MATTER is before the Court on Plaintiff James Norvell's Federal Rule of Civil Procedure 50(b) Motion for Judgment as a Matter of Law on his wrongful termination in violation of public policy claim and on his alternate Rule 59 Motion for a New Trial. Dkt. 222. In support of each motion, Norvell argues that the Court's jury instruction on the core elements of his claim was a misstatement of the law.

Norvell also seeks a new trial based on the Court's jury instruction on his duty to mitigate his non-economic damages, *id*. at 13; the Court's admission of Brian Heikkila's rebuttal testimony, *id*. at 14; and based on counsel's informing the jury of Norvell's arbitration back pay award, *id*. at 18.

The issues are addressed in turn.

**A.  Instruction 13 was an accurate statement of the law.**

Norvell's sole claim is a state law claim for wrongful termination in violation of public policy. Norvell asserts that BNSF terminated his employment for throwing his locomotive's reverser to stop his train in a successful effort to save the life of his fellow trainman, John Reynolds, and to avoid a potentially catastrophic accident at the small, crowded, and dangerous Willbridge Yard. He claims there is a clear public policy favoring taking action to save a life, even if it violates a company rule, and BNSF's termination violated that public policy.

BNSF asserts it fired Norvell, not because acted in violation of the rules to avoid an accident, but because he put himself in a position where he had to do so. It claims Norvell failed to properly prepare his train by "adding" air brakes and, by going too fast, created the situation where he had to throw the reverser to avoid a crash. It cited Norvell with his second "Level S" violation and ultimately terminated his employment.

Norvell responds that no BNSF rule or policy required him to employ his air brakes, and he denies that he exceeded the Yard's 10 mile-per-hour speed limit. BNSF replies that in addition to specific rules, its overarching, express written policy required Norvell to operate his train in a safe manner. Norvell counters that the train's brakes did not work properly, and that is why he had to use the reverser. That is the gist of the case. The trial involved resolving these competing factual disputes.

1      The Court informed the parties at the November 21, 2021 Pretrial Conference[1] that
2 its jury instruction would include BNSF's proposed language, bolded below:

> Nine is the wrongful termination proposed by plaintiff, 10 is the one proposed by the defendant. I find the plaintiff's simpler and adequate, and am open to -- In BNSF's it has a statement, "**A company may take into consideration whether an individual's actions created the potentially harmful situation when determining appropriate action**." I think that sentence is a correct statement of the law. And I think it is all that BNSF needs from its instruction to have an instruction from which it can argue its theory of the case, its defense.
> Again, I'm not asking for final comment here. These are preliminary rulings only. Certainly the Court will be open to further discussion.

November 21, 2021, Pretrial Conference transcript, Dkt. 173 at 8 (emphasis added).

Consistent with this stated intention, the Court's Jury Instructions provided:

INSTRUCTION NO. 13

> It is unlawful to terminate an employee for performing a public duty. There is a public policy and duty in favor of taking swift action to save human life regardless of whether such action violates a company rule. **A company may take into consideration whether an individual's actions created the potentially harmful situation when determining appropriate action.**
> To recover on his claim of wrongful termination in violation of public policy, Plaintiff has the burden of proving that a substantial factor motivating Defendant's decision to terminate his employment was his performing a public duty. "Substantial factor" does not mean the only factor or the main factor in the challenged act or decision.
> If you find from your consideration of all of the evidence that Plaintiff has not met this burden, then you must find for the Defendant.
> If you find from your consideration of all of the evidence that Plaintiff has met this burden, then you must find for Plaintiff.

---

[1] The Court is accordingly not persuaded by Norvell's additional claim that, in preparing for and presenting evidence in the trial, he relied on the draft instructions the Court had emailed to the parties three days before the Pretrial Conference and that the subject instruction was a last-minute surprise. Dkt. 222 at 13 (citing Dkt. 222-3).

ORDER - 3

Jury Instruction No. 13, Dkt. 204 at 15 (emphasis added).

In support of each of his post-trial motions, Norvell argues that this instruction was a misstatement of the law and misleading. He argues that the instruction was not only novel and unsupported by precedent, but it also created an "absolute defense for BNSF without assigning a burden of proof or otherwise explaining how it was to be applied." Dkt. 222 at 10. Norvell claims that when the correct law is applied to the facts, he is entitled to judgment as a matter of law. *Id.* at 5 ("[T]he law must be applied 'as it should be, rather than the law as it was read to the jury,' even if the party did not object to the jury instructions." (quoting *Fisher v. San Jose*, 558 F.3d 1069, 1074 (9th Cir. 2009)).

Norvell argues that under the correct law applied to the facts, the "sole requirement" for him to prevail was to "show that the public-policy linked conduct was a 'significant factor' in the decision to terminate him." *Id.* at 10 (quoting *Martin v. Gonzaga Univ.*, 191 Wn.2d 712, 723 (2018) and citing *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 75 (1991)). He argues that under *Gardner v. Loomis Armored Inc.*, 128 Wn.2d 931, 944 (1996),[2] saving a life is "easily recognized as a clear public policy." Dkt. 222 at 8.

---

[2] *Gardner* explained that the tort of wrongful discharge in violation of public policy was limited to four scenarios: "(1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for *performing a public duty or obligation*, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistle-blowing." 128 Wn.2d at 936 (emphasis added) (internal citation omitted). Norvell asserts his claim under the second scenario.

Thus, he claims, it was error for the Court to instruct the jury on what amounts to an "overriding justification" defense under the fourth element of the "Perritt" test, which applies only where the claim does not "fit neatly" within one of *Gardner*'s four clear categories of clear public policy. *See* Dkt. 222 at 8–10. Under the Perritt test, a plaintiff's wrongful termination in violation of public policy claim includes the element that "the defendant [is] not able to offer an overriding justification for the dismissal (the absence of justification element)." *Id*. at 8 n.3 (citing *Martin*, 191 Wn.2d at 723).

Norvell effectively argues that BNSF's claimed reason for firing him was irrelevant, that the instruction was not an accurate statement of the law, and that he is entitled to judgment as a matter of law. The Court does not agree that the instruction was a misstatement of law, for reasons a review of the applicable cases will show.

In *Gardner*, the plaintiff was an armored truck driver and guard. His employer, Loomis, had a "fundamental" rule forbidding its drivers from leaving the armored vehicle. While he and his partner were making a stop at a bank, Gardner observed armed bank robbers taking hostages. He exited the vehicle to save a hostage and ultimately helped disarm a suspect. Loomis fired him, and he sued. Loomis argued it fired him not for saving the hostage, but for exiting the vehicle, which was forbidden by an important company rule. *See Gardner*, 128 Wn.2d at 934–35.

The Washington Supreme Court held that such a termination was a violation of public policy, which clearly encourages such heroic action:

> Loomis' work rule does not provide an overriding justification for firing Gardner when his conduct directly served the public policy encouraging citizens to save persons from serious bodily injury or death. We find that

> Gardner's discharge for leaving the truck and saving a woman from an imminent life threatening situation violates the public policy encouraging such heroic conduct . . . . Our holding merely forbids Loomis from firing Gardner when he broke the rule because he saw a woman who faced imminent life-threatening harm, and he reasonably believed his intervention was necessary to save her life.

*Id*. at 949–50.

The facts of *Gardner* were "highly unique," justifying the "refined analysis" of the Perritt test's fourth, overriding justification element. *Martin*, 191 Wn.2d at 724 (internal quotation omitted). Loomis argued that its "do not leave the truck" rule was an overriding justification for its termination; it was too important even for an exception like saving a hostage.

But neither the undisputed facts nor the parties' arguments in *Gardner* are akin to those here. To be sure, Norvell relies on *Gardner* in support of his contention that he threw the reverser to save a life and that it was therefore a violation of public policy for BNSF to fire him for violating the rule against throwing the reverser and damaging the train. But unlike Loomis, BNSF's defense was *not* that its rule against throwing the reverser was an overriding justification for terminating him; if it were, this case would be on "all fours" with *Gardner*, and under that authority Norvell might be entitled to judgment as a matter law.

Instead, BNSF argued—and the jury's verdict demonstrates it agreed—that it had an alternate reason to fire Norvell: operating his train in a manner that led to a situation where he had to take emergency action to prevent an accident and save a life (and because the resulting "Level-S" violation was his second in a month). *Gardner* did not

address such a situation, and neither it nor any subsequent case holds that an employer cannot posit an alternate reason for terminating an employee who claims he was acting in furtherance of a defined public policy.

The Washington State Supreme Court more recently addressed a case similarly involving a claimed termination in violation of public policy and a defense based on alternate reasons. *See Martin*, 191 Wn.2d at 717–22. The plaintiff in *Martin* was a Gonzaga University employee. He repeatedly expressed to his employer his concern that the University's gym needed padding around the basketball court to protect students playing there. Gonzaga fired him, based on what it claimed was insubordination and poor job performance. He sued, arguing that he was terminated in violation of public policy for whistleblowing about the gym padding. The trial court granted summary judgment in Gonzaga's favor.

Employing a familiar burden-shifting framework, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Washington Supreme Court held that Martin had met his initial "burden to show that his discharge may have been motivated by reasons that contravene a clear mandate of public policy." *Martin*, 191 Wn.2d at 725 (internal quotation omitted). It held that Martin could not satisfy his burden of showing that the public-policy linked conduct was a "significant factor" in the decision to terminate him. *Id*. Even if he had, however, Gonzaga showed that it terminated Martin for legitimate reasons, insubordination and job performance, based on the evidence of the same in his file. *Id*. at 726. The burden then shifted back to Martin to show that, despite these legitimate reasons for his discharge, his whistleblowing was a significant factor in his

termination. *Id*. at 727. Because there was "a paucity" of evidence linking the termination to the alleged whistleblowing, the Court affirmed the summary judgment in Gonzaga's favor. *Id*.

In this case, the Court determined that there was evidence from which a reasonable jury could conclude that Norvell was terminated for throwing the reverser and that there was evidence supporting BNSF's claim that he was terminated for improper train handling: for putting his train in a dangerous position in the first place. Under each of these authorities, where a question of fact remains, the matter is for the jury.

The case that most closely tracks the parties' positions in this case is the Washington Supreme Court's 1991 opinion in *Wilmot*, which answered Certified Questions from the Eastern District, and which pre-dates *Gardner*. *See Wilmot*, 118 Wn.2d at 51–53. There, plaintiff Wilmot filed a workers' compensation claim for an on-the-job injury. His employer fired him, ostensibly for absenteeism. Wilmot sued, arguing he was terminated for filing a worker's compensation claim, and that his termination violated public policy.

The Washington Supreme Court held that a plaintiff asserting a wrongful discharge in violation of public policy claim must prove that his public-policy linked conduct was a "substantial factor" in his termination—which remains the law today. *Id*. at 71. It explained that under the substantial factor test, once a defendant articulates a reason for the termination, the plaintiff can effectively respond either by "showing that the reason is pretextual, or by showing that although the employer's stated reason is legitimate, the worker's pursuit of . . . workers' compensation benefits was nevertheless a

substantial factor motivating the employer to discharge the worker." *Id*. at 73. The Supreme Court then explained, by way of example, how the parties' competing views on the reasons behind the termination might be resolved:

> [1. A]n employee may be injured on the job, file a workers' compensation claim, and then be discharged without resulting liability to the employer if the reason for the discharge was the fact that the employee failed to observe health and safety standards, even though that failure resulted in the work-related injury for which the benefits claim was filed.
>
> [2]. If that injury, resulting from failure to heed health and safety standards, causes the worker to be absent from work for a period of time which contravenes the employer's policy against absenteeism, liability still may not attach.
>
> [3.] If, however, the employee can present sufficient evidence to prove that the pursuit of or intent to pursue workers' compensation benefits was also a significant factor in the decision to discharge, then the employer's stated reasons, while constituting legitimate nonpretextual reasons for the discharge, will not preclude liability.

*Id.* at 75 (paragraphs and numbering added).

The first of these hypotheticals tracks BNSF's view of the case; it terminated Norvell for causing the situation, not for taking emergency action to resolve it. The third reflects Norvell's view; he argues that throwing the reverser and damaging the train was a substantial factor in BNSF's decision to terminate him and that such a termination violates the public policy in favor of saving human life. He denies that he put his train in a bad position and disputes the veracity of BNSF's claimed reasons for termination. The veracity of these competing reasons was a question for the jury.

The Court's Jury Instruction No. 13 informed the jury that it should consider and resolve the parties' competing assertions about the reasons for the termination and that

Norvell had the burden to prove by a preponderance of the evidence that his public-policy linked conduct was a substantial factor in BNSF's decision to terminate him. BNSF's articulated reasoning is not an affirmative defense, and BNSF did not have the burden of proving it. It was not an "overriding justification" for the termination, it was an alternate reason for it, just as in *Martin*. Contrary to Norvell's claim, the jury's consideration of BNSF's alternate reasoning was not an "absolute defense;" if the jury found Novell had proved that throwing the reverser itself was a substantial factor in his termination, the instruction plainly told it that its verdict should be in his favor. It was not.

Instruction No. 13 is an accurate statement of the law under these authorities, and it makes sense. It would have been misleading to *not* tell the jury it could consider BNSF's alternate reasoning, when these authorities make clear that those reasons are entitled to such consideration.

Norvell's Motion for Judgment as a Matter of Law, and his alternate Motion for a New Trial, based on Instruction No. 13 are DENIED.

**B.     Instruction 15 was an accurate statement of the law.**

Norvell also argues that the Court's Instruction No. 15 was error, warranting a new trial. That instruction related to BNSF's affirmative defense of Norvell's failure to mitigate his damages:

INSTRUCTION NO. 15

Plaintiff has a duty to use reasonable efforts to mitigate his emotional harm damages. To mitigate means to avoid or reduce damages.
Defendant has the burden of proving by a preponderance of the evidence that the Plaintiff failed to use reasonable efforts to mitigate his emotional harm damages.

1  Jury Instruction No. 15, Dkt. 204 at 17.

2  Norvell argues that he sought only non-economic (or emotional) damages and that 3 it was error to instruct the jury that he had a duty to mitigate those damages. He claims 4 there is not a single case holding that such an instruction is proper where a plaintiff seeks 5 only non-economic damages. Dkt. 222 at 13. Norvell does not cite any case for the 6 proposition that such an instruction is error, or that he did not have a duty to mitigate his 7 emotional distress damages.

8  As an initial matter, any error was harmless because the jury did not find that 9 Norvell had no damages; rather, it found that he did not prove that his public-policy 10 linked conduct was a significant factor in BNSF's decision to terminate him. As such, the 11 jury never even reached the issue of damages. *See* Jury Verdict, Dkt. 207 (the damages 12 lines are properly blank, not "$0," consistent with its defense verdict).

13  Secondly, as BNSF accurately points out, the bulk of the emotional distress 14 Norvell claimed to have suffered as the result of his termination related to financial 15 stress, which would have been mitigated by remaining at BNSF after he was reinstated, 16 or obtaining other, better-paying work after he left. There is no plausible argument that 17 the defense verdict was based on this instruction.

18  Norvell is not entitled to a new trial based on this instruction. His motion on this 19 basis is DENIED.

**C. Heikkila's testimony does not warrant a new trial.**

Next, Norvell argues that he is entitled to a new trial because the Court permitted Brian Heikkila to offer undisclosed testimony about Norvell's train handling. BNSF argues, persuasively, that this issue has already been resolved. Dkt. 223 at 17.

As BNSF argues in response, Heikkila and his opinions were disclosed in 2019, well before the pandemic-delayed trial, and Norvell chose not to depose him. Heikkila's supplemental report was not inconsistent with his disclosed opinions, and the Court already ruled that his testimony was "within his disclosure." *Id*. (citing Harrison Decl. Dkt. 177, Ex. B). Heikkila's November 26, 2021 supplemental report was filed promptly after Norvell's expert's, Jim Scott, November 19, 2021 deposition and after BNSF received Scott's supplemental report. *Id.* And, as BNSF argues, Norvell had but did not take the opportunity to rebut Scott's testimony. Norvell is not entitled to a new trial based on Heikkila's testimony. His motion for a new trial on this basis is DENIED.

**D. Counsel's fleeting mention of Norvell's back pay award does not warrant a new trial.**

Finally, Norvell argues that he is entitled to a new trial because BNSF's counsel informed the jury[3] of the amount of back pay the collective bargaining agreement arbitrator awarded to Novell, notwithstanding the Court' ruling *in limine* that the only arbitrator's award would only be used to show that he was reinstated with backpay. Dkt.

---

[3] Counsel started to ask whether Novell got "a backpay award of $363[.]" Dkt. 222 at 18 (citing rough draft of December 2, 2021 Trial Transcript at 37, which is not in the record). The question was not answered, and the Court instructed the jury that questions and statements of counsel are not evidence.

222 at 18. He argues that he was prejudiced because the clear implication of the testimony was that he had already been made whole. *Id*.

BNSF responds that it, not Norvell, moved *in limine* to have the arbitrator's award excluded from evidence, for fear it would suggest to the jury that liability had been decided. Dkt. 223. at 20. It argues that the Court instructed the jury about the arbitration and what it did and did not mean for this case. *Id*. (citing Jury Instruction No. 9, Dkt. 204 at 11). The Court did not specifically rule that the amount of the back pay award was inadmissible, and BNSF correctly points out (as it did in connection with the mitigation instruction) that Norvell and his girlfriend both testified that the reason he did not seek assistance for his emotional harm was his claimed inability to pay for it. Thus, it argues, the fact and amount of his back pay award was relevant and admissible. It did not argue that Norvell had been made whole by that award.

The Court agrees that the counsel's unanswered question, and any other limited references to Norvell's pay, did not prejudice Norvell and does not warrant a new trial under Rule 59.

Norvell's motion for a new trial on this basis is DENIED.

\*\*\*

Norvell's motion for Judgment as a Matter of Law, or in the alternative for a New Trial, Dkt. 222, is DENIED. Norvell's pending Motion to Re-Tax Costs, Dkt. 227, will be addressed in a separate Order.

\\

\\

IT IS SO ORDERED.

Dated this 15th day of April, 2022.

BENJAMIN H. SETTLE
United States District Judge